**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

FIDELITY AND DEPOSIT COMPANY
OF MARYLAND; ZURICH AMERICAN
INSURANCE COMPANY,

    Plaintiffs,

v.

RIESS FAMILY, LLC; ROBERT A.
RIESS, SR.,

    Defendant Third-Party Plaintiffs,

and

REBECCA RIESS,

    Defendant Third-Party Plaintiff -
    Appellant,

v.

GEORGE THOMPSON; TSUR, L.L.C.;
ALLIANT INSURANCE SERVICES,
INC.,

    Third-Party Defendants - Appellees.

No. 18-5056
(D.C. No. 4:16-CV-00270-GKF-FHM)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

_____

Before **McHUGH**, **BALDOCK**, and **KELLY**, Circuit Judges.
_____

In this tort action under Oklahoma law, third-party plaintiff Rebecca Riess appeals from the district court's grant of summary judgment to third-party defendants George Thompson, TSUR, L.L.C. (TSUR), and Alliant Insurance Services, Inc. (Alliant). Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Riess is married to Robert Riess, who was the President and Chief Executive Officer, as well as a minority owner, of Sheehan Pipe Line Construction Co. (Sheehan Pipe Line). Sheehan Pipe Line needed to secure payment and performance bonds to pursue certain lucrative pipeline construction projects. Zurich American Insurance Company and its subsidiary Fidelity and Deposit Company of Maryland (together, the Sureties) agreed to issue the bonds. Thompson, who does business through TSUR and works with Alliant, acted as the broker for the deal.

The Sureties wanted David Sheehan (the majority owner of Sheehan Pipe Line), Robert Riess, and their wives to pledge their personal assets in a General Indemnity Agreement (GIA) that would indemnify the Sureties against any claims on the bonds. Riess was opposed to risking her personal assets, but ultimately she signed the GIA, along with the Sheehans and Robert Riess. Sheehan Pipe Line ended up declaring bankruptcy, and the Sureties sought to collect under the GIA.

2

After the Sureties filed suit against the Sheehans and the Riesses, Riess in turn sued Thompson, TSUR, and Alliant for "misrepresentation" and "negligence," alleging that she had been induced to sign the GIA only because Thompson had represented that the Sureties would issue a rider excepting her personal assets from the GIA. The parties filed competing motions for summary judgment. Analyzing Riess's claims under the principles applicable to constructive fraud and negligent misrepresentation as well as negligence, the district court held that Riess had failed to produce admissible evidence upon which a reasonable jury could find the elements of reliance (for constructive fraud and negligent misrepresentation) and proximate cause (for negligence). It therefore granted the third-party defendants' motion for summary judgment and denied Riess's motion for summary judgment. Riess appeals.

## DISCUSSION

### I.      The appeal is not moot.

The third-party defendants suggest that this appeal is moot. On the same day that the district court granted summary judgment to the third-party defendants, it also granted summary judgment to the Sureties on their claims against the Riesses. After the district court's rulings, the Riesses and the Sureties filed a joint stipulation dismissing all their claims against one another with prejudice. The third-party defendants point out that Riess sought to recover from them any monies she would have to pay to the Sureties. But, they assert, there no longer is any case or controversy between Riess and the Sureties.

3

> Appellant's Appendix and the record below are silent on any adverse consequence to her of her Indemnity Agreement with the Sureties. Even if the dismissal was pursuant to a settlement, there is no record of it; no record that it requires her to pay anything; no record that she is required to pay any part of any settlement out of her separate assets. Thus, as the record stands, Rebecca Riess no longer has a personal stake in the outcome of the present appeal, and an actual case or controversy necessary to sustain federal jurisdiction no longer exists.

Aplee. Resp. Br. at 2-3.

In granting summary judgment to the Sureties, the district court held that they were entitled to "indemnification in the amount of $12,726,582.16" as well as attorney's fees totaling $267,070.18. Aplt. App'x, Vol. VIII at 1775. Riess states that she "paid an undisclosed, substantial sum to settle and resolve the summary judgment" in favor of the Sureties. Aplt. Reply Br. at 2. She asserts that she therefore retains a personal stake in the appeal, in that she now seeks to recover the amounts she paid, as well as her attorney's fees.

"Article III delimits the jurisdiction of federal courts, allowing us to consider only actual cases or controversies. Accordingly, a plaintiff must possess a personal interest in the outcome of a case at all stages of the proceedings." *Kan. Judicial Review v. Stout*, 562 F.3d 1240, 1245 (10th Cir. 2009) (citation omitted). "A party claiming that there is no longer a live case or controversy bears the burden of demonstrating mootness." *Id.* "A case is moot when it is impossible for the court to grant any effectual relief whatever to a prevailing party. The crucial question is whether granting a *present* determination of the issues offered will have some effect

4

in the real world." *Petrella v. Brownback*, 787 F.3d 1242, 1255-56 (10th Cir. 2015) (citation and internal quotation marks omitted).

The third-party defendants have not carried their burden of showing there is no longer a live case or controversy between them and Riess. The question, in evaluating mootness, is whether this court can grant Riess any effectual relief. And we can. This appeal does not concern any failure to prove damages, but rather Riess's failure to identify admissible evidence to support other elements of her claims. If we were to conclude the district court erred and reverse the judgment in favor of the third-party defendants, Riess would be free to pursue her claims in the district court. If Riess lacks damages, she might not have winning claims, but at this juncture it is not apparent that she can have no damages. In these circumstances, the lack of record proof of damages does not moot the appeal.

## II. The district court did not err in granting summary judgment.

### A. Standard of Review

"We review a district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1285 (10th Cir. 2018) (brackets and internal quotation marks omitted). For summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Importantly, a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim. Such a movant may make its prima facie demonstration simply by pointing out to the court a lack of evidence

5

for the nonmovant on an essential element of the nonmovant's claim." *Schulenberg*, 911 F.3d at 1286 (brackets and internal quotation marks omitted). "In response, the nonmovant bears the burden to set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for [her]." *Id.* (internal quotation marks omitted).

"To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (internal quotation marks omitted). But "[t]his does not mean that summary judgment evidence must be submitted in a form that would be admissible at trial." *Id.* (brackets and internal quotation marks omitted). It is sufficient if "the content or substance of the evidence" would be admissible at trial. *Id.* (internal quotation marks omitted). Therefore, a party may rely on evidence in an inadmissible form, so long as she shows "that it will be possible to put the information, the substance or content of the evidence, into an admissible form." *Id.* (internal quotation marks omitted).

## B. Proceedings in the District Court

Riess alleges that Thompson represented that the Sureties would issue a rider excluding her personal assets from the reach of the GIA, causing her to sign the GIA. The district court noted that the elements of both constructive fraud and negligent misrepresentation include reliance, and the elements of negligence include proximate cause. It granted judgment to the third-party defendants on the ground that Riess had

6

failed to submit admissible evidence showing that she relied on any such representation by Thompson.

### 1. The Thompson E-Mail

Riess initially alleged that she relied on a certain e-mail message sent on January 30, 2015, by Thompson to Leonard Pataki, Sheehan Pipe Line's general counsel (the Thompson e-mail). The Thompson e-mail stated:

> Thank you Leonard for all your help.
>
> . . .
>
> Zurich has agreed to issue a rider to the GIA excluding the personal assets of Tamara [the majority owner's wife] and Rebecca [Riess] that are not construction assets. For example for Tamara it would be the house in Tulsa, the condo in Hawaii but not limited to that. David and Rob are aware of this and what I will need is a list from both for Zurich to review.

Aplt. App'x, Vol. II at 485.[1] Riess alleged that her husband showed her the Thompson e-mail before she signed the GIA.

In their summary judgment briefing, however, the third-party defendants asserted that Riess *could not* have relied on the Thompson e-mail because it was created *after* Riess signed the GIA. They established the following chronology of events on January 30 (all times Central):

- Undetermined time before 12:56 p.m.—Riess and Robert Riess signed the GIA while at his parents' house in Illinois. Robert Riess then went to his brother's office, where he scanned the executed signature pages.

---

[1] Thompson testified at his deposition that he mistakenly typed that Zurich had agreed to issue a rider, when what he meant to say was that Zurich had agreed *to consider* issuing a rider.

7

- 12:56 p.m.—Robert Riess e-mailed the executed signature pages to Pataki, who was in Oklahoma.

- 1:57—Pataki assembled the entire GIA, including the signature pages, and e-mailed the document to Thompson, who was in Florida.

- 2:15—Thompson responded to Pataki, thanking him for his help with the GIA. (This is the Thompson e-mail.)

The third-party defendants asserted that this timeline was supported by (1) the content of the e-mail messages (Riess's sending of the executed signature pages had to come before Pataki's transmission to Thompson and Thompson's response); (2) Pataki's transmission e-mail was titled "Zurich—Sheehan GIA" and the Thompson e-mail was titled "Re: Zurich—Sheehan GIA," *id.*, showing that the Thompson e-mail was a response or reply to Pataki's e-mail; (3) when adjusted for time zone (Pataki was in the Central time zone, and Thompson was in the Eastern time zone), the messages' time-stamps show that Pataki's e-mail preceded the Thompson e-mail; and (4) expert testimony established that Thompson had received the executed signature pages before he sent the Thompson e-mail. In disputing this timeline, Riess simply relied on her own testimony that the couple did not arrive at Robert Riess's parents' house until sometime around 2:15 Central time, and therefore they could not have executed the signature pages before that time. The district court held that Riess had not created a genuine issue of fact as to whether the Thompson e-mail actually existed when she signed the GIA, and if the Thompson e-mail did not exist when she signed, she could not have relied on it.

8

## 2. Alleged Prior Oral Representations

During the summary-judgment briefing, Riess asserted that the exact timing of the Thompson e-mail was not important because it reflected prior oral conversations, upon which she had relied. She stated that "Robert testified that prior to signing the GIA, he was told by Pataki that George Thompson had relayed Zurich's agreement to issue a Rider excluding the personal assets of Rebecca from the GIA." Aplt. App'x, Vol. V at 1072. "Everything Rebecca knew or understood concerning the GIA stems from Robert, her husband, relaying his conversations with Pataki to her." *Id.* at 1074; *see also id.* at 1083 ("Thompson, in writing the January 30th Email, was documenting a discussion held between Pataki and himself occurring earlier in the day on January 30, 2015. Robert, Rebecca's husband, relayed to Rebecca the information he learned from Pataki, that the assets of Rebecca were excluded from the GIA." (footnote omitted)).

The district court held that the evidence of any conversation between Thompson and Pataki, as related by Pataki to Robert Riess, was hearsay. Because the evidence would be inadmissible at trial, the court held, it also was insufficient for Riess to avoid summary judgment. And it held that the next level of conversation, between Robert Riess and Riess, also was inadmissible because it was predicated on the inadmissible alleged conversation between Pataki and Robert Riess. *See* Fed. R. Evid. 805 (allowing hearsay within hearsay only "if each part of the combined statements conforms with an exception to the rule"); *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 650 (10th Cir. 2008) ("For hearsay within hearsay to be

9

admitted as evidence, a hearsay exception must apply to each link of the chain.").
The district court further rejected Riess's argument that the Thompson e-mail
evidenced a representation made by Thompson to Robert Riess. It therefore
concluded that summary judgment in favor of the third-party defendants was
appropriate because Riess had failed to come forward with admissible evidence that
Thompson's purported representations had been communicated to her before she
signed the GIA.

### C. Analysis

#### 1. The Thompson e-mail is insufficient to allow Riess to avoid summary judgment.

On appeal, Riess argues that there are genuine disputed issues of material fact
concerning the timing and the intent of the Thompson e-mail. We disagree.

As to the timing of the Thompson e-mail, the third-party defendants identified
several pieces of evidence, supported by an expert opinion, that the Thompson e-mail
was created after Riess signed the GIA. In response, Riess relied on her own
unsupported assertion that she saw the e-mail before signing the GIA. Under these
circumstances, Riess's denial does not create a genuine dispute of material fact.

"At the summary judgment stage, facts must be viewed in the light most
favorable to the nonmoving party only if there is a genuine dispute as to those facts."
*Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted). A party
opposing summary judgment "must do more than simply show that there is some
metaphysical doubt as to the material facts. Where the record taken as a whole could

10

not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (ellipsis and internal quotation marks omitted). Relevant to this case, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

Given the technical and common-sense evidence adduced by the third-party defendants that the Thompson e-mail was created after Riess signed the GIA, the record blatantly contradicted Riess's assertions that she saw the Thompson e-mail before signing, so that no reasonable juror could credit Riess's assertions. Thus, the district court correctly held that the timing of the Thompson e-mail is not a genuine issue of disputed material fact.

As for the intent of the Thompson e-mail, Riess argued that the statement that "David and Rob are aware of this" meant that Thompson had told Robert Riess that Zurich had agreed to issue the rider.[2] The district court disagreed, stating, "when read in context, the cited sentence refers to Thompson's assertion that Zurich would need a list of assets sought to be excluded, *not* Robert Riess's awareness that Surety had agreed to exclude Rebecca Riess's personal assets." Aplt. App'x, Vol. VIII at 1796.

---

[2] "David" may have referred to David Sheehan, or to David McVicker, the Vice President for the Surety Group for Zurich American Insurance Company.

11

We agree with the district court that the Thompson e-mail cannot be read as Riess would have it. The statement "David and Rob are aware of this" "does not "establish[] that *George Thompson had previously told 'Rob'* that Zurich had agreed to issue a Rider," as Riess urges. Aplt. Opening Br. at 15 (emphasis added). At most, the statement evidences Thompson's belief that an unidentified "Rob," presumably Robert Riess, was aware that Zurich had agreed to issue a rider. But the source of Rob's knowledge is not specified, so the statement alone fails to establish Thompson's liability. Without additional evidence, the inference is a mere scintilla, insufficient to allow Riess to avoid summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

### 2. The district court did not err in its hearsay analysis.

Riess also asserts that the district court erred in excluding evidence of Pataki's conversation with Robert Riess, and Robert Riess's conversations with Riess, as hearsay. Hearsay is an out-of-court statement that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). It is inadmissible unless an exception applies. Fed. R. Evid. 802.

Riess states that "[t]he Pataki to Robert link is not offered for the truth of the matter. . . . Rather, this link is submitted for the fact that the statement was made, not for its truthfulness." Aplt. Opening Br. at 24. The third-party defendants respond that, to the contrary, "the 'matter asserted' is: 'Thompson said Zurich has agreed to

12

exclude Rebecca's personal assets.'" Aplee. Resp. Br. at 31 (bold, italics, and emphasis omitted). They therefore urge us to uphold the district court's determination that Pataki's statement to Robert Riess is inadmissible hearsay.

"It is essential to understand that 'the matter asserted' is the fact being asserted by the declarant in uttering the statement." *United States v. Lewis*, 594 F.3d 1270, 1282 (10th Cir. 2010). In the Pataki-Robert Reiss conversation, the declarant is Pataki, Fed. R. Evid. 801(b), and the fact he is asserting when speaking with Robert Riess is that Thompson had said that Zurich would issue a rider to exclude Riess's personal assets. To move forward with her tort claims, Riess has to prove that she relied upon a statement by Thompson that Zurich would issue a rider to exclude her personal assets. She cannot succeed against Thompson just by showing that she relied upon a statement by Pataki; she has to show that Thompson actually made the statement that eventually made its way to her. She therefore must be offering the evidence of the Pataki-Robert Riess conversation to prove the truth of the matter that Pataki asserted, i.e., that Thompson had made the representation. Accordingly, as the district court held, the Pataki-Robert Riess part of the chain is hearsay.

Riess also suggests that Pataki is not a necessary part of the chain because the Thompson e-mail "clearly states that he had directly relayed Zurich's position to Robert Riess." Aplt. Opening Br. at 25. As discussed above, however, the Thompson e-mail does not lend itself to that inference, even viewed in the light most favorable to Riess. And as the district court noted, Riess presented no other evidence

13

(such as testimony by Robert Riess) to show any representations (or misrepresentations) from Thompson directly to Robert Riess.

Riess further appears to suggest that the district court disregarded the Pataki-Robert Riess conversation because of the form of the evidence, rather than the content or substance. She states that the content could be made admissible through Pataki's testimony at trial. *See Brown*, 835 F.3d at 1232. But the district court's ruling did not depend on the form of the evidence, and Riess does not explain how live testimony at trial would take the statements out of the hearsay arena. (For example, while Pataki might be able to testify about a conversation with Thompson under Fed. R. Evid. 801(d)(2), concerning admissions of a party-opponent, that rule would not extend to testimony about a conversation between Pataki and Robert Riess.) She therefore has failed to establish that the content or substance of the evidence would be admissible.

### 3. This panel cannot overrule this court's binding precedent.

Finally, Riess complains that this circuit's "view on the admission of hearsay that can be made admissible at a later stage of the proceedings is narrow." Aplt. Opening Br. at 27. She points out that other circuits allow the consideration of inadmissible hearsay on summary judgment when the evidence could be presented in admissible form at trial, and she urges this court to bring its practice into conformity with the other circuits.

It appears that Riess has misapprehended our precedent. As noted above, this court does allow a district court to consider summary-judgment evidence that is

14

submitted in an inadmissible form, so long as the content or the substance of the testimony could be presented in an admissible form at trial. *See Brown*, 835 F.3d at 1232. But even if our precedent departs from the practices in other circuits, one panel cannot overrule this court's binding precedent "[a]bsent an intervening Supreme Court or en banc decision." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1183 (10th Cir. 2018).

## CONCLUSION

The district court's judgment is affirmed.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

15